## JOHNSON *v.* CURRIN.

Devise to testator's daughter, her heirs and assigns, and "if any of my daughters die without heirs of their body, their part to be equally divided between the survivors of them and my grandchildren, counting A.'s children as one, and B.'s children as one:" *Held*, an executory devise to the grandchildren and surviving daughters, and not a remainder, which could be barred by the first taker.

The devise over to the grandchildren is subject to no contingency of survivorship, and hence vested in such of them as were living at the testator's death, and passed by descent on their dying, living the first devisee.

IN error from the Common Pleas of Juniata.

Ejectment and special verdict. Jacob Walker died, leaving three daughters, Jean, Margaret, and Ann; four children of his deceased son James, and five children of his deceased daughter, Elizabeth Stewart. By his will, dated in 1829, he devised certain land to three of his grandchildren. *To his daughters Jean* and Eliza he devised other land to be divided between them, *to them, their heirs and assigns for ever.* To others of his grandchildren he gave lands in fee, or subject to certain payments. To his granddaughter Mary, her heirs and assigns, other land, subject to a payment to others of his devisees. To his daughter Ann, certain land, "upon conditions, in case she have an heir or heirs of her body, then to them, their heirs and assigns for ever; but, in case of no heirs," then for life only, and that her husband might also be maintained out of it, should he need it. To his daughter Margaret other land, "the said Margaret to enjoy it during her natural life, and if she have any heirs of her body, then to them,

their heirs and assigns in fee." If she had no heirs, her husband was to be entitled to a support out of the profits for life. To his daughter Jean, he devised other land and personal property "to her and her heirs and assigns for ever. * * * And lastly, in case any of my daughters dies without heirs of their body, I do, and it is my will, that their part, as above bequeathed to them, be equally divided between the survivors of them and my grandchildren, counting James Walker's four children one, and Elizabeth Stewart's four children one." He further authorized his executors to sell certain land, and also any after-purchased land, and divide one-half of the proceeds " equally between my five heirs ; that is to say, James's children, Elizabeth Stewart's children, Ann, Margaret, and Jean," as also all moveables and other personalty, and to pay the other half, at the daughters' deaths, to their heirs.

Jean married Johnson, and they joined in a deed barring the (supposed) estate tail. The grantee re-conveyed to Johnson, who devised to his wife Jean, who survived him, and devised the same to her sisters for life, remainder to the defendant, and died without issue.

The plaintiffs were: three children of testator's son, James Walker; (the fourth died intestate, and without issue, after the testator and before Jean Johnson): McCurdy, the son of one of the children of Elizabeth Stewart, mentioned in the will; (the other three there mentioned died intestate, and without issue, after the testator and before Jean Johnson): and Lukens, a son of a daughter of Elizabeth Stewart, who died before the testator.

*Parker* and *Reed*, for plaintiffs in error.—That this was an estate tail, with a remainder over in fee, is settled. The words, " dying without heirs or issue," have always been so construed. And they must be so to permit the plain intention to operate: 1. That all descendants of the first taker shall enjoy the land before the devise over operates. 2. That the limitation shall be supported as not too remote whenever it can be. The rule is well stated in 4 Kent, 273 ; but the cases in this state are sufficient, and thousands of titles are dependent upon them. The legal construction already put on them, binds the court : 3 S & R. 476. That construction was made in 9 W. 450; 11 S. & R. 441; 6 W. 18; 2 Y. 200; 221; 3 S. & R. 470; 4 Ib. 509; 6 Ib. 31; 15 Ib. 148; 17 Ib. 6; 5 Barr, 463; 1 Wh. 139. If by heirs of the body is meant children, what will become of great-grandchildren, whose parents and grandparents died in the lifetime of the testator ? Or, if con-

strued words of purchase, where are the remainder-men, if the issue survive the first taker but for an instant ?   To avoid these difficulties, the rule has been settled as it is, and not from any fondness for entails, but because by no other possible contrivance can the two-fold intention of the testator be carried out.   That an indefinite period was intended, is shown by the limitation over. Suppose all the remainder-men died in the lifetime of the first taker, were their heirs not to take ?—and yet this can be construed as an executory devise only on that assumption.

But if an executory devise, then nothing vested in any of the devisees dying during the continuance of the life-estate; nor can Lukens, whose ancestor was dead before the date of the will, take any part.

*Banks* and *Hepburn*, contrà.—If, by heirs of the body, the testator has shown that he meant children, the case is a plain one for the plaintiffs; and that he has done so is clear on the reasoning in 5 Barr, 461.   If, then, this was the intention, it is settled that all rules, from the technical meaning of words, are overruled: 1 Tam. 347.   That this was a conditional fee, with executory devise over within lives then in being, is shown by 5 Day, 517 ; 2 Mass. 56 ;   1 Spence. 6 ;   1 Harr. 475 ;  2 Murphy, 82 ;  3 Dev. 394 ;  3 Dev. & Bat. 438; 7 Greenl. 710 ; 2 Cow. 333 ; 10 John. 12 ; 17 S. & R. 295 ;  6 Barr, 45 ;  Fearn. on Rem. 554 ;  Willes, 211; 1 Ired. 145.   The interest is transmissible, independently of the act of 1810.

*June* 22.   COULTER, J.—The true guide to the construction of any devise in a will, is the general and manifest intent of the testator, as it can be discovered and collected from the whole will. Any minor, or, apparently, secondary interest, must yield, if inconsistent with, and repugnant to, the general intent.   We therefore look to all the phrases and clauses of the instrument, aided by a knowledge of the condition and habits of life of the testator ; and all, and each, furnishing aid in ascertaining his meaning and intent, in any particular clause or devise.

From the earliest date after the first statute authorizing the making of wills in England, the courts began to lean in favour of giving effect to the intent of the testator, even when opposed to well-established rules of descent, as governed by artificial phrases in a deed.   Thus, Littleton saith, " Where lands be given to a man and his heirs male, he hath no estate tail, and therefore he hath a

fee simple. But if one, by his last will, devise lands to a man and his heirs male, this, by construction of law, is an estate tail, the law supplying these words (of his body):" Co. Lit. § 31. And, as early as the time of Lord Coke, it was adjudged that, any words denoting an intention to give an estate tail, will pass an estate tail to the devisee: Wild's case, 6 Co. 16; 1 Vent. 229. Thus, a devise to a man and his son will create an estate tail: Bifield's case, 1 Vent. 231. So an estate tail may arise in a will by implication, in order to give effect to the intent of the testator: Goodright *v.* Goodridge, Willes, 369. And it was, in fact, an attempt to give effect to the intent of the testator which gave rise to the very rule about which so much has been said in this case, and such multitudinous authorities cited; to wit, that a limitation over, after an indefinite failure of issue, was too remote, and the first devisee took an estate tail. Such a rule could never have been adopted, except with a view of perpetuating estates in the lineal descendants; and would not have been adopted except where that result was a favourite object among landed proprietors, and where it was in accordance with the general policy of the country. Nothing more clearly indicates that this was the true reason for establishing the rule, than this, that at the very same time, and in relation to the very same words, the limitation over was held good in relation to personal estate. Thus, as to real estate, the words *if he die without issue,* or even the words *if he die leaving no issue,* were construed to mean that, if no issue were living, or the line became extinct, one hundred or five hundred years after the death of the first devisee, it imported an indefinite failure of issue; but the same words in regard to personal estate imported that there should be no issue living at the time of the first devisee's death, and therefore a limitation over was good. A devise of an estate in fee may be cut down, by other parts of the will evidencing an intent to do so, to an estate tail; and a devise for life may be enlarged in the same way, or, by implication, into an estate in fee tail: Cro. J. 448; Dyer, 333. The whole doctrine of executory devises arose from a desire in the courts to give effect to the intent of the testator, contrary to the strict rules of the common law. Mr. Fearne says, that an executory devise is admitted in the construction of wills, though contrary to the rules of limitation in conveyances at common law: Fearne on Remainders, 386.

The rule of the English law on this subject is succinctly stated by Vice-Chancellor Plumer, " that it is a general rule with regard to the construction of wills, that the testator's meaning is to

be collected from the will itself, taking in aid the general rules of construction established by decisions." The court is not to make a will, but declare the plain meaning of the words : Noel *v.* Weston, 2 V. & B. 271. In Robinson *v.* Robinson, 1 Burr. 38, it was ruled that the manifest general intent of the testator must prevail over technical words used in a will, apparently showing a particular or secondary intent. But the case of Perrin *v.* Blake, 4 Burr. 2581, is the great English case on the subject, and the strongest, in which it was ruled that the manifest intent of the testator will control the legal and technical operation of the word "heirs" as a limitation, and convert it into a word of purchase, as descriptive of the person intended to take. I had supposed that in this state it was long settled that the intent of the testator was the cardinal rule, the very cynosure of judicial interpretation or construction. Yet the rule in Shelley's case, and the rule about indefinite failure of issue, or failure within a life in being and twenty-one years after, will raise their heads like departed ghosts to disturb the profession. If there was nothing in the will but those very words which made the rule, or on which it was established, I should say that they indicated the intent of the testator. But when mingled with other words, or when the words occurred in a subsequent part of the will, which show a contrary intent, they are powerless to control or suppress or overcome the intent. If it were not so, a man would make his will and die, and yet he would have no will in the matter.

Laying aside, then, the multitude of cases as to what words create an estate tail, or cut down a fee simple into a fee tail, or what words mean an indefinite failure of issue, or a failure within a life or lives in being and twenty-one years afterwards, which were cited by the learned counsel from the English books, and the repetitions of them in the American books, let us go to the fountain-head, the will itself, of David Walker, a substantial Irish farmer, of a good name, and see if we can ascertain what he did mean by his devise of the plantation to his daughter Jean and her heirs. He first gave her a fee simple. Of that there is no doubt. The devise is to her, and her heirs and assigns for ever. He had two other daughters, to whom he devised each a portion of real estate, and he had grandchildren, who were the children of a deceased son and daughter, to whom he also devised real estate. He then devises as follows :

"8th, and lastly, in case any of my daughters die without *heirs* of their bodies, I do, and it is my will that their part, as above

bequeathed to them, be equally divided between the *survivors of them* and my grandchildren, counting James Walker's four children one, and Elizabeth Stewart's four children one." Now, at what point of time did the testator contemplate that his daughters should be without heirs of their bodies? Was it when they died, or four hundred, or one hundred years afterwards? If an individual says of another that he died without issue, does not everybody understand that he had no issue at the time of his death? Or if, in common parlance, it is said, if John Doe dies without issue, his brothers will inherit his estate, does not every one understand the expression to refer to John's having no issue at the time of his death? Thus, Mr. Walker, the testator, using the common language of the country, provided that if his daughter Jean should die without heirs of her body, her share should go to her surviving sisters, and the children of James Walker and Mrs. Stewart, who were his grandchildren, he must have meant that if she had no heirs of her body when she died, her share should go to her *surviving* sisters, and to his grandchildren. That was the point of time, the death of either of his daughters; for if it was not, how could it survive to the *other daughters* and to the grandchildren. If the failure of issue was to happen by an extension of the time, at any future period of indefinite duration, how could it be limited to persons then *in esse?* The very limitation contemplated, could only be effectual by the failure of issue whilst they were alive. If the testator meant that if Jean had children or heirs of her body when she died, instead of that she had not, who would also, in their appointed time, have heirs of their bodies, and be gathered to their fathers, but that at some remote period of time the line might become extinct, and therefore, in that event, he gave it to her surviving sisters, and to his grandchildren, who would live beyond that indefinite period of time, then the plaintiff in error would be entitled to success, because any limitation so absurd and grotesque could not be executed by the law. But the very absurdity of the meaning attempted to be forced on the testator against his will, by the application of antiquated rules, shows that he could have had no such intent. No sane man could intend to limit an estate over to persons then in being upon an indefinite failure of issue of the first taker; that is, upon a failure that would happen after all those who are called survivors, and their children's children, would be in their graves. Then the testator meant by his language, and it plainly and naturally bears that import, that if his daughters had no children of their bodies at the time of their death, their share, as it

could not descend to heirs of the body, should go to the heirs or survivors whom he designated. Indeed, I find it difficult to make the expression more distinct and definite than I find it in the will, without encumbering it with circumlocution. But the testator knew how to create an estate tail, as is very evident from the language he uses in the devise to Margaret Stewart, if he had thought proper to do so. It is evident, however, that he intended to give a fee simple to Jane, upon condition of her having heirs of her body *in esse* at the time of her death; but that if she did not, the estate in fee should be extinct, and the land should go over as limited in the will. It may vest in them as an executory devise, or even as a remainder, contingent upon the first taker having no issue living at the time of her death; but above all, it can be supported as carrying into operation the manifest intent of the testator.

The next question is, in what proportions?

Of the four children of Elizabeth Stewart, referred to in the will, David, William, and Mary died intestate and without issue, *after* their grandfather and *before* their aunt Jean Johnson. Eliza, the fourth one, was married to Dr. Cyrus McCurdy, and died after her grandfather and before her aunt Jean, leaving one son, Horace McCurdy, one of the plaintiffs. Eliza Stewart had another child named Ann, who was married to Abraham Lukens, and died before her grandfather, leaving issue one son, John Stewart Lukens, one of the plaintiffs. Jane Currin, Eliza Patterson, and Mary Templeton, are three of the children of James Walker, mentioned in the will—the fourth, David, died intestate and without issue, before his grandfather and aunt Jean.

It is a rule, that an executory interest, whether in real or personal estate, is transmissible to the representatives of the devisee, when such devisee dies before the contingency happens, and if not disposed of, will *vest in such representatives*, when the contingency happens: Fearne on Rem. 554. The clause in the will is, 'and in case any of my *daughters* dies without heirs of their body, I do, and it is my will, that their part, as above bequeathed *to them*, be equally divided between the survivors *of them*, and my grandchildren, counting James Walker's four children one, and Elizabeth Stewart's four children one.' The *survivorship* here is confined to the daughters; there is no contingency in that respect as to the grandchildren. In regard to them, it was an executory interest that was transferable, and we are relieved from the necessity of determining whether the survivorship referred to the time of the

death of the testator, or the happening of the contingency on which the estate went over.

The plaintiffs, therefore, are entitled to a one undivided half part of the land in dispute, one-half whereof to go to Currin and wife, Patterson and wife, and Templeton and wife, as representing James Walker's four children; and of the remaining half thereof, five undivided eighth parts to Horace ·McCurdy, and the other three undivided eighth parts to John Stewart Lukens, they being the sole heirs and representatives of the four children of Elizabeth Stewart.

Judgment affirmed.